HILTON HEAD RESORT FOUR SEASONS CENTRE HORIZONTAL PROPERTY REGIME COUNCIL OF CO–OWNERS, INC., Plaintiff,

v.

GENERAL STAR INDEMNITY COMPANY; and LEXINGTON INSURANCE COMPANY, Defendants.

No. CIV.A. 9:03–2987–08.

United States District Court,
D. South Carolina,
Beaufort Division.

Feb. 15, 2005.

Russell Stanley Stemke, Russell S. Stemke, Isle of Palms, SC, for Plaintiff.

William. C. Cleveland, Buist Moore Smythe and McGee, Charleston, SC, Mark A. Crawford, Buist Moore Smythe and McGee, Charleston, SC, Laurie E. Dugoniths, Fellows Johnson Davis and LaBriola, Atlanta, GA, Clayton H. Farnham, Drew Eckl and Farnham, Atlanta, GA, C. Michael Johnson, Hurt Richardson Garner Todd and Cadenhead, Atlanta, GA, Elizabeth Clarke King, Drew Eckl and Farnham, Atlanta, GA, Clayton B. McCullough, Pratt–Thomas Pearce Epting and Walker, Charleston, WV, Henry M. Quillian, III, Fellows Johnson and La Briola, Atlanta, GA, for Defendants.

### ORDER

BLATT, Senior District Judge.

This matter is before the Court on the Plaintiff's complaint for breach of contract, bad faith refusal to pay first-party benefits, and breach of the covenant of good faith and fair dealing. This action arises out of a dispute concerning insurance coverage for the repair and/or replacement of the mansard roofs [1] of two buildings within

---

1. According to the parties and expert affidavits, a mansard roof is a decorative structure, triangular in shape, that extends out beyond the side of a building. It does not cover any

the Plaintiff's condominium complex. The Defendants have filed separate motions for summary judgment, to which the Plaintiff has responded. A hearing was held on January 7, 2005, at which the parties presented additional argument. The matter is now ripe for decision.

*Background Facts*

The mansard roofs in question were originally constructed when the buildings were built around 1980 or 1981. In 1997, the asphalt shingles originally laid down were covered with interlocking aluminum shingles nailed to a starter strip along the bottom edge of the mansards. In 1999, hurricane Floyd narrowly missed the South Carolina coast. The resulting winds blew some of the aluminum shingles off the roofs, and damaged others.

The Plaintiff sought remedy against the shingle installer and manufacturer, and filed a wind damage claim with General Star. During the subsequent investigation, it was noted by at least two people that the roof decking wood was treated with a fire-retardant, which may have deteriorated the wood in the mansard roofs. Reports of these findings eventually made their way to the Plaintiff's counsel. In addition, in May 2001, the Plaintiff asserts that it noticed, for the first time, that the mansards were treated with fire-retardant wood.

The Plaintiff asserts that it notified the insurance agency from which it purchased the General Star policy several times, to no avail. Finally, in November, 2002, the Plaintiff submitted a proof of loss form to both General Star (the primary insurer) and Lexington (the excess insurer), asserting that it had "suffered a covered loss to covered property, i.e. the 'collapse' of the mansard roofs" of Buildings 1 and 2, in the amount of $1,596,540.00.

It is undisputed that at no time has any mansard roof physically fallen off a building to the ground. A report by a defense engineer notes that the roofs "displayed no sagging or drooping, and no members had gaped, slipped, or separated from other members" as of December 2002. The report also notes that some repairs had been made to the mansards, including the "sistering" of newer two-by-fours onto the original wood and the replacement of some decking. The Plaintiff's engineer submits that the roofs were and are in "imminent danger of collapse," which could occur "without delay." In a September, 2002, letter, the engineer asserted that upon his inspection some eleven months earlier (in October 2001), he noticed that several large staples fastening the trusses were corroded, and that wood analysis demonstrated a "decay of the wood composition with a potential loss of up to 75% load-carrying capacity."

*General Star Indemnity Company*

Among the several issues in debate in this case, the central issue is that of the policy language itself and how it is interpreted. Under the General Star Indemnity policy, damage caused by "collapse" is not insured "except as provided below in the Additional Coverage for collapse." This provision, in turn, reads in relevant part as follows:

D. ADDITIONAL COVERAGE—COLLAPSE

The terms Covered Cause of Loss includes the Additional Coverage—Collapse as described and limited in D.1. through D.5. below.

1. We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this coverage form, if the collapse is

of the living area of the building, and does not                   bear any weight except that of its own beams.

caused by one or more of the following:

a. The "specified causes of loss" or breakage of building glass, all only as insured against in this Coverage Part;

b. Hidden decay;

c. Hidden insect or vermin damage;

d. Weight of people or personal property;

e. Weight of rain that collects on the roof;

f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in D.1.a. through D.1.e., we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse.

.    .    .    .    .

If the collapse is caused by a cause of loss listed in D.1.b. through D.1.f., we will pay for loss or damage to that property only if:

a. Such loss or damage is a direct result of the collapse of a building insured under this Coverage Form; and

b. The property is Covered Property under this Coverage Form.

■ The Plaintiff contends that the damage to the mansard roofs constitutes a "collapse" under the policy, citing *Ocean Winds Council of Co–Owner, Inc. v. Auto–Owners Insurance Company,* 350 S.C. 268, 565 S.E.2d 306 (2002). In that case, the Supreme Court of South Carolina was asked to interpret an insurance policy covering "risks of direct physical loss involving collapse of a building or any part of a building." In so doing, the court took the middle-of-the-road interpretation:

First, it is important to note that most cases involve simply the use of the single word "collapse," and not the entire phrase at issue here: "risks of direct physical loss involving collapse." ....

Courts construing this phrase have taken various approaches. Three have construed it to mean collapse must be imminent. "Imminent" means collapse is "likely to happen without delay; impending or threatening" and requires a showing of more than substantial impairment. Two courts have construed the phrase to mean "substantial impairment," the most lenient standard.

In our view, to construe the phrase "*risks* of direct physical loss *involving* collapse" as requiring actual collapse is too narrow an interpretation. This phrase is more expansive than the word collapse and appears to cover even the threat of loss from collapse. Further, as noted by courts rejecting the actual collapse standard, such an interpretation encourages an insured to neglect repairs and allow a building to fall, which is economically unsound and contrary to the insured's duty to mitigate damages.

On the other hand, as courts rejecting the "substantial impairment" standard have noted, collapse coverage should not be converted into a maintenance agreement by allowing recovery for damage which, while substantial, does not threaten collapse.

We find a requirement of imminent collapse is the most reasonable construction of the policy language covering "risks of direct physical loss involving collapse." We define imminent collapse to mean collapse is likely to happen without delay.....

*Ocean Winds Council,* 565 S.E.2d at 308 (citations omitted).

The main stumbling block of the Plaintiff's argument is that the policy provision in *Ocean Winds Council* is markedly different from the language at issue here. The distinction is not a different interpretation of the word "collapse;" rather, it is the scope of coverage outlined in the policies themselves. A policy covering *"risks* of direct physical loss *involving* collapse," (emphasis added) as the court noted, "appears to cover even the threat of loss from collapse." *Id.*[2] Here, however, General Star's policy provides coverage for "direct physical loss or damage to Covered Property, *caused by* collapse of a building or any part of a building" (emphasis added). This policy language requires not just the threat of collapse, and not just collapse itself, but actual loss or damage caused by a collapse.

It is undisputed that none of the mansards, or any part of them, suffered an actual collapse during the applicable policy period, or indeed have collapsed to this date. Moreover, the Plaintiff has demonstrated nothing to indicate any direct physical loss or damage as a direct result of a collapse of the mansard roofs.[3] At most, the Plaintiff has mansard roofs with deteriorated wood, in "imminent danger of collapse" for over three years, which have not caused any direct loss or damage to any covered property. General Star had no duty under the insurance contract to provide coverage. Accordingly, General Star cannot be said to have acted in bad faith, breached the contract of insurance, or breached any covenant of good faith and fair dealing with respect to the claim made in November, 2002. Summary judgment is therefore appropriate.[4]

*Lexington Insurance Company*

■ Defendant Lexington Insurance Company provided a policy of excess insurance on the buildings in question, applicable after the first one million dollars in damages. Defendant Lexington asserts, and it is not denied, that the Plaintiff elected the optional "Replacement Cost" coverage, which does not require Lexington to pay for *any* loss "(1) until the lost or damaged property is actually repaired or replaced; and (2) unless the repairs are made as soon as reasonably possible after the loss or damage."

There have been no repairs to the mansard roofs in question during the policy period, and the Plaintiff has failed to demonstrate that it has paid such repair or replacement costs in an amount exceeding $1,000,000.00. As a result, no duties on

2. Justice Pleicones, in dissent, argues that the majority's construction of the policy replaces the unambiguous coverage-triggering event, collapse, with the ambiguous phrase "collapse is likely without delay." 565 S.E.2d at 308. Respectfully, this Court disagrees, and notes that the policy language in *Ocean Winds Council* was much broader than actual collapse, as pointed out by the majority. *Id.*

3. The court in *Ocean Winds Council* noted that the question was certified to it by the federal court because of the disagreement among courts with what "collapse" actually means. Some courts found it ambiguous and, giving the insured the benefit of the doubt, considered a collapse to be a "substantial impairment" of the building's "structural integrity." 565 S.E.2d at 307 (citations omitted). Other courts found the term unambiguous and required a "falling in, loss of shape, or reduction to flattened form or rubble." *Id.* (citations omitted).

The Plaintiff is apparently construing the *Ocean Winds Council* case to mean that the Supreme Court of South Carolina defined the word "collapse" to mean "imminent collapse." However, as noted by the majority and by this Court, the policy language at issue was actually much broader. The Supreme Court made no direct ruling on the meaning of the term "collapse," without more.

4. Because the Court has decided the matter on this preliminary issue, it is unnecessary to address the parties' other arguments.

891

the part of Lexington have arisen under the contract of insurance. Therefore, the Plaintiff's suit for breach of contract, bad faith, and breach of covenant against Lexington Insurance Company based on the November, 2002, claim has no merit, and summary judgment is also appropriate.[5]

Based on the foregoing, it is

ORDERED that the Defendant General Star Indemnity Company's motion for summary judgment is granted; that the Clerk of Court shall enter judgment in favor of the Defendant General Star Indemnity Company; that the Defendant Lexington Insurance Company's motion for summary judgment is granted; that the Clerk of Court shall enter judgment in favor of the Defendant Lexington Insurance Company; and this action is ended.

**IT IS SO ORDERED.**

---

5. This grant of summary judgment applies only to the claim made by the Plaintiff in November, 2002, and does not preclude the Plaintiff from making a claim under this policy in the future, should the necessary prerequisites be met at a later date.