RENDERED:  APRIL 21, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0409-MR

GREENVILLE CUMBERLAND
PRESBYTERIAN CHURCH                                          APPELLANT


                    APPEAL FROM MUHLENBERG CIRCUIT COURT
v.                  HONORABLE BRIAN WIGGINS, JUDGE
                    ACTION NO. 20-CI-00015


STATE AUTO PROPERTY &
CASUALTY COMPANY AND
GREENVILLE INSURANCE, INC.                                   APPELLEES


OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE:  CALDWELL, ECKERLE, AND KAREM, JUDGES.

CALDWELL, JUDGE:  Greenville Cumberland Presbyterian Church appeals from

summary judgment granted in favor of the opposing parties in a dispute about

whether damage to a building was covered as a collapse under an insurance policy.

We reverse and remand with directions to enter partial summary judgment for the

Appellant and for further proceedings in conformity with this Opinion.

# FACTS

Greenville Cumberland Presbyterian Church ("the church") bought property insurance from State Auto Casualty & Property Company ("the insurer") through Greenville Insurance, Inc. ("the agency"). The policy provided additional coverage for collapse – specifically, for direct physical loss or damage caused by the collapse of a building or part thereof resulting from specified causes including hidden decay. But the term *collapse* was not defined in the policy.

In the fall of 2019, the church filed a claim after discovering structural problems following efforts to replace the metal roof covering on its sanctuary. The church building remained standing, and no major portion of the building had fallen down to the ground. However, the ceiling and roof framework had dropped significantly – including dropping several inches over a several-day period according to one observer – in a portion of the sanctuary.

Some trusses in the roof framework were indisputably sliding down the sanctuary walls, causing the walls to rotate outward. Upon an engineer's recommendation, emergency bracing was installed as a temporary measure to reduce the risk of the roof and walls from falling down entirely.

The insurer denied the claim, stating *inter alia* there was no covered collapse since neither the building, nor any part thereof had abruptly fallen down.

The church filed suit against the insurer and agency for claims including breach of contract, bad faith, and negligence.

Both the church and the insurer later filed motions for partial summary judgment on the issue of coverage. The trial court granted the insurer's motion for partial summary judgment, stating the breach of contract claim failed as a matter of law because there was no collapse under the facts. It noted its reliance on Kentucky precedent strictly defining the term *collapse* – which it characterized as the "rubble on the ground" standard.

The trial court later granted the Appellees' motions for summary judgment on all claims and declared its prior partial summary judgment final and appealable with no just cause for delay. Shortly thereafter, the church filed a timely appeal. Further facts will be discussed as necessary.

## ANALYSIS

**Relevant Legal Standards**

We review the trial court's grant of summary judgment *de novo*. *See, e.g.*, *Shelton v. Kentucky Easter Seals Soc., Inc.*, 413 S.W.3d 901, 905 (Ky. 2013). When ruling on a summary judgment motion, the trial court is not charged with resolving any issues of fact but determining whether any genuine issues of material fact exist and whether the moving party is entitled to judgment as a matter of law.

In doing so, the trial court must view the evidence in the light most favorable to the party opposing summary judgment. *Id.*

The interpretation of insurance contract provisions is a matter of law subject to *de novo* review. *Thiele v. Kentucky Growers Insurance Company*, 522 S.W.3d 198, 199 (Ky. 2017). Limitations on coverage must be clearly stated and exclusions or exceptions will be narrowly construed. All doubts or ambiguities must be resolved in the insured's favor since the insurer drafts the policy language. *Bidwell v. Shelter Mut. Ins. Co.*, 367 S.W.3d 585, 588 (Ky. 2012). *Eyler v. Nationwide Mut. Fire Ins. Co.*, 824 S.W.2d 855, 859-60 (Ky. 1992).

Nonetheless, "if no ambiguity exists, a reasonable interpretation of an insurance contract is to be consistent with the plain meaning of the language in the contract." *Pryor v. Colony Ins.*, 414 S.W.3d 424, 430 (Ky. App. 2013). Clear and unambiguous terms shall be enforced as written. *Kemper Nat'l Ins. Companies v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 873 (Ky. 2002).

Failing to define a term in the insurance policy does not always result in ambiguity. *Davis v. Progressive Direct Insurance Company*, 626 S.W.3d 518, 521 (Ky. 2021). And generally, courts must apply the "ordinary and everyday meaning" of words yet: "If two reasonable interpretations exist, the interpretation favoring the insured prevails." *Id.*

An essential tool to determining if an ambiguity exists is the reasonable expectations doctrine, which provides: "the insured is entitled to all the coverage he may reasonably expect to be provided under the policy. Only an unequivocally conspicuous, plain and clear manifestation of the company's intent to exclude coverage will defeat that expectation." *Bidwell*, 367 S.W.3d at 589 (quoting *Simon v. Continental Ins. Co.*, 724 S.W.2d 210, 213 (Ky. 1986)).

**Relevant Insurance Policy Provisions**

The policy contained an Additional Coverage provision for collapse stating, in relevant part: "We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this policy, if the collapse is caused by one or more of the following: . . . (b) Hidden decay; (c) Hidden insect or vermin damage[.]" The provision also states: "Collapse does not include settling, cracking, shrinking, bulging or expansion." But the policy does not define *collapse*.

The policy also contained an exclusion for loss or damage caused by collapse "except as provided in the Additional Coverage for Collapse."[1] And the policy contained provisions establishing duties in the event of loss or damage,

---

[1] The collapse exclusion provision further states: "But if collapse results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss." (Record (R.), p. 162). Covered Causes of Loss are "Risks of Direct Physical Loss" unless the loss is subject to an exclusion or limitation stated in the policy. R., p. 153.

including a duty to: "Take all reasonable steps necessary to protect the Covered Property from further damage . . . ."

**Binding Precedent Holds Collapse Has Plain Meaning and Defines Term**

The church argues the evidence shows a collapse of part of the building and distinguishes this case from *Thiele*, 522 S.W.3d at 198, and *Niagara Fire Ins. Co. v. Curtsinger*, 361 S.W.2d 762 (Ky. 1962). We must follow holdings about collapse in *Curtsinger* and *Thiele* as precedent from Kentucky's highest court. *See* SCR[2] 1.030(8)(a). But we must also consider whether the evidence here establishes a collapse under the holdings of this binding precedent. Applying the plain meaning definition of collapse set forth in *Curtsinger* and *Thiele*, we agree with the church that the evidence here establishes a collapse of part of the building.

Like this case, both *Thiele* and *Curtsinger* required interpretation of insurance policies providing coverage for direct physical loss or damage from the collapse of all or part of a building. *Curtsinger*, 361 S.W.2d at 763; *Thiele*, 522 S.W.3d at 199. Like the policy here, the policy in *Thiele* stated: "Collapse does not mean settling, cracking, bulging, or expanding." *Id.* But the policy in *Thiele* did not define *collapse*. *Id.* at 202 (Wright, J., dissenting). And presumably the

---

[2] Kentucky Supreme Court Rules.

policy in *Curtsinger* did not define *collapse* either as no definition in the policy is mentioned in the opinion.

Kentucky's highest court has held that "the word 'collapse' in connection with a building or other structure [] has a well-understood common meaning" and quoting Webster's Collegiate Dictionary, the plain meaning is: "To break down or go to pieces suddenly, especially by falling in of sides; to cave in." *Thiele*, 522 S.W.3d at 199 (quoting *Curtsinge*r, 361 S.W.2d at 764).[3] Our Supreme Court specifically rejected in *Thiele* the argument that *collapse* should be defined in a broad manner to include major structural damage altering the basic stability of a building. Instead, our Supreme Court reaffirmed *Curtsinger*'s holding, after referring to *Curtsinger* as controlling and quoting its definition of *collapse*. *Thiele*, 522 S.W.3d at 199-200. So, we must follow binding precedent and apply the plain meaning of collapse as defined in *Curtsinge*r and *Thiele*:[4] "To break down or go to pieces suddenly, especially by falling in of sides; to cave in." *Id*.

---

[3] *Curtsinger* does not identify any edition number or publication date but simply refers to Webster's Collegiate Dictionary for the common meaning of *collapse.*

[4] In a recent unpublished case, we recognized we were bound to apply the definition of *collapse* provided in *Curtsinger* and *Thiele*, despite suggesting in a footnote that perhaps our Supreme Court should reconsider its stance on interpreting *collapse* in insurance coverage disputes. *Sauer v. Kentucky Farm Bureau Mutual Insurance Company*, No. 2020-CA-0424-MR, 2021 WL 3435455, at *2 (Ky. App. Aug. 6, 2021), *discretionary review denied* (Dec. 8, 2021).

But this plain meaning definition of *collapse* set forth in binding precedent does not expressly require that something fall all the way to the ground or be reduced to rubble on the ground, as insinuated by the trial court. Furthermore, there is evidence that a part of the building fell all the way to the ground, leaving debris (a/k/a rubble) on the ground – namely, the affidavit of engineer Harold Gaston.

### Evidence Shows a Collapse as Defined by Binding Precedent

The church contends the trial court erred in concluding there was no collapse based on the evidence before it. Based on our review of the evidence in the record, we agree. Gaston's affidavit was among the evidence submitted to the trial court along with the parties' respective motions for partial summary judgment. The evidence also included Gaston's September 26, 2019, letter to the church,[5] the insurance company's letter denying the claim, and the reports of engineers Kurt Bergman and Jordan Yeiser.

Gaston had inspected the building at the church's request in early September 2019, after a contractor noticed something was not right with the roof structure after removing the metal roof covering. Gaston's initial inspection was limited due to lack of access to the attic. After the attic opening was enlarged

---

[5] A September 27, 2019, letter from Gaston to the church on other matters concerning any options for repairing or rebuilding the sanctuary building also appears in the record. But ultimately it was determined that the building could not be fixed so it was later torn down.

several days later, Gaston returned for further inspection. Upon his recommendation, emergency bracing was put in place in the sanctuary.

Gaston reported his findings to the church in the letter to the church dated September 26, 2019. He recalled that the contractor told him the roof was falling before his first visit. He noted his initial inspection was performed on September 7th, but he returned on September 18th after the attic opening was enlarged. He observed, and stated in his letter, that over this several-day period, "the ceiling/roof had dropped a few more inches." He further stated, "The roof had over many years experienced a bowing of the wood members in the roof and the roof has a curve on both sides" and that the walls "were bowing outward on each side of the sanctuary." Gaston noted this portion of the building was believed to be over one hundred years old.

Gaston opined that a long-term water leak had caused ends of the roof trusses to decay and fail. He noted there was evidence of prior repairs to the trusses – including placing newer lumber within the last 20 years. He explained his decision to recommend emergency bracing as he feared "the roof of the building was imminent to collapse" and "the walls will fall as a secondary collapse due to the way the roof would fall." He indicated that the bracing was a temporary solution.

The insurer argued to the trial court that an imminent collapse was not enough to trigger coverage in its motion for partial summary judgment; instead, an actual collapse was required to trigger coverage. The church countered by offering evidence of engineers opining there was an actual collapse of part of the building. The church attached to its response and cross-motion for partial summary judgment an affidavit by Gaston, in which he clarified his opinions from the letter. It also submitted the report of engineer Jordan Yeiser.

Engineer Yeiser noted some exterior sanctuary walls had rotated significantly outward and he was asked to determine the cause of the "collapse of the exterior walls and roof framing." He remarked the temporary bracing was put in place "to prevent full collapse." He opined there was a "sudden failure of the main roof truss bearing" due to hidden decay caused by moisture which had not been evident in the sanctuary and which led to a "sudden collapse of the roof framing."

In Gaston's affidavit, he similarly opined there had been a collapse of part of the building and that the roof structure collapsed due to hidden decay causing some truss ends to deteriorate and the roof structure to fall down. And he explained what he meant by his late September 2019 letter to the church:

> when I stated that "[i]t was my thought that if nothing was done the roof of the building was imminent to collapse[,] I meant that the *entire roof* was imminent to *completely collapse*. It remains my opinion that the roof

-10-

structure dropped and fell down significantly, which in
my opinion is a collapse of a part of the building.

He also averred he had observed debris on the ground including "paint and small wood chips and/or sawdust right underneath where the truss had collapsed."

The insurer submitted the report of its own engineer, Bergman. Like the other engineers, Bergman stated that some roof trusses were sliding down the walls, pushing the walls outward. Bergman also noted water damage and decay and difficulties in accessing the attic as well as evidence of prior repair to the trusses. He described the damage as the "partial failure of the roof structure." But unlike the other engineers, Bergman did not describe any events as sudden, and he did not use the term *collapse.* He simply opined that the state of the building resulted from long-term processes including truss spreading and decay.

As the church points out, the policy provides coverage not just for collapse of the whole building but also for collapse of a part of the building. It points out Gaston described a sudden dropping of the roof structure and Yeiser referred to a sudden failure of some roof truss bearings. And it emphasizes both Gaston and Yeiser opined that a collapse of part of the building occurred.

The mere usage of the word *collapse* in these opinions may not be determinative – after all, the claimants in *Curtsinger* and *Thiele* asserted the property damage they suffered amounted to collapse but the appellate courts rejected these arguments based on the underlying facts. But even disregarding the

-11-

use of the word *collapse* in describing the damage, we conclude that the evidence established a collapse as defined by binding precedent.

As the church argues, there is evidence showing a collapse of part of the building under the *Curtsinger/Thiele* definition. "This is what occurred in the Church's sanctuary – the roof structure began caving in, as the trusses slid down the walls, pushing the walls outward." Unlike what it describes as gradual subsidence of the building in *Curtsinger*[6] and *Thiele*,[7] the church argues there is evidence that part of the building suddenly fell down, broke down or perhaps went to pieces despite the gradual process of hidden decay. For example, the church points to Gaston's observation in his letter that the roof structure had fallen a few more inches in less than two weeks and Yeiser's statement that a "sudden failure of the main roof truss bearing occurred." And it points to Gaston's observation of debris on the ground noted in his affidavit to argue: "Pieces of the ceiling or roof

---

[6] Some evidence described in *Curtsinger* suggests a more sudden event where the homeowners heard a loud noise one evening and "the next morning discovered the porch floor and roof had broken loose from the house, and the front 'had gone down about a foot.'" 361 S.W.3d at 764. Still, *Curtsinger* involved subsidence of the floor rather than roof structure falling down as here.

[7] *See also Sauer*, 2021 WL 3435455 at * 2 (no collapse of any part of building under *Curtsinger/Thiele* definition despite bedroom floor dropping several inches and bedroom wall pulling away from roof and leaving opening due to hidden termite damage as facts were similar to those in *Curtsinger* and the "home did not break down, go to pieces, or cave in as required under the definition of collapse"). This unpublished opinion is not binding authority. Kentucky Rules of Appellate Procedure ("RAP") 41(A). But we mention it simply because the parties discuss it in their briefs. *Sauer* involved part of a home subsiding like *Curtsinger* and *Thiele* – rather than portions of the roof structure falling down as occurred here.

-12-

structure collapsed all the way to the floor, where Gaston observed them being cleaned up."

This evidence shows a collapse under the explicit requirement of the *Curtsinger/Thiele* "plain meaning" definition. As pointed out by the dissent in *Thiele*, applying the actual language of the plain meaning definition, a collapse could occur when a building or a part thereof either breaks down **or** goes to pieces based on the words used in *Curtsinger*'s definition – and the "suddenly" language might apply only to going to pieces but perhaps not to something breaking down. *Thiele*, 522 S.W.3d at 200 (Wright, J., dissenting). The dissent would have affirmed the trial court's determination that a collapse had occurred as a factual finding supported by substantial evidence. *Id*.

Though the majority in *Thiele* disagreed with the dissent's approach, *Thiele* and *Curtsinger* involved different facts. For example, *Curtsinger* concerned damage resulting from a porch floor subsiding, pulling it and the roof away from the building. 361 S.W.2d at 764-65. In contrast, in the present case the roof structure/framework dropped down significantly obviously from above – in a fashion more akin to the common understanding of falling in or caving in than the facts in *Curtsinger*. After all, after defining *collapse* in the context of buildings as especially indicating falling in or caving in, the Kentucky high court in *Curtsinger*

simply stated the trial court should have ruled as a matter of law that there was no *collapse* under the facts there. *Id.*

In contrast to *Curtsinger*, the facts are not described in great detail in the majority opinion in *Thiele* other than generally alluding to extensive termite damage. 522 S.W.3d at 199. But regardless of any arguable evidence of anything breaking down, even the dissent admitted there was no evidence of a substantial part of the building falling down in *Thiele* – as some structural elements in the building (concrete blocks) made this practically impossible so that coverage for hidden insect damage was illusory. *Id.* at 201 (Wright, J., dissenting).

While the insured did not prevail on the coverage issue in *Thiele*, *Thiele* is distinguishable because there was no dispute that the facts did not show a collapse as defined by *Curtsinger*. 522 S.W.3d at 199. Conceding there was no collapse under *Curtsinger*'s definition, the insured argued for a broader definition of collapse to apply – *i.e.*, one recognizing major structural damage affecting a building's stability as a collapse in *Thiele*. Our Supreme Court elected not to broaden the definition of collapse but reaffirmed *Curtsinger*. *Id.* at 199-200.

In contrast, the church has not argued that a different definition of collapse should apply. Instead, it has argued that the evidence here showed a collapse as defined by *Curtsinger*. We agree with the church's argument. As pointed out by the church, *Curtsinger* and a recent unpublished opinion from this

-14-

Court[8] are distinguishable because they involve subsidence of the floor rather than a roof structure falling down.

The parties have not cited any Kentucky appellate opinion, published or unpublished, which has determined whether damage caused by any part of a roof falling down amounts to a collapse of part of a building. The Appellees though cited case law to the trial court from other jurisdictions in which courts determined that evidence of roof and/or ceiling damage did not amount to collapse of a building or part thereof under a strict actual collapse standard. But these cases are not binding and are distinguishable.

For example, one case involved shingles blowing off the roof and some deterioration of roof materials with an imminent threat of collapse, but no proof of the roof structure suddenly dropping. *See Hilton Head Resort Four Seasons Centre Horizontal Property Regime Council of Co-Owners, Inc. v. General Star Indem. Co.*, 357 F. Supp. 2d 885, 886 (D.S.C. 2005). And other ceiling or roof damage cases cited involved subsidence-type issues like *Curtsinger* or *Thiele*. *See Gage v. Union Mut. Fire Ins. Co.*, 122 Vt. 246, 169 A.2d 29 (1961), *Olmstead v. Lumbermens Mut. Ins. Co.*, 22 Ohio St. 2d 212, 259 N.E.2d 123 (1970). Furthermore, the language used by other state's courts in defining collapse often differs. *See, e.g., Gage*, 169 A.2d at 30 (applying plain meaning of collapse

---

[8] *See generally Sauer*, 2021 WL 3435455.

-15-

and alluding to dictionary definitions, including one incorporating the language: "To fall together or into an irregular mass or flattened form . . .").

But regardless of any factual or other distinctions with non-binding, extra-jurisdictional precedent about whether roof or ceiling damage can be considered collapse, the evidence here established a collapse under the explicit requirements of binding Kentucky precedent. Clearly, there was evidence of a part of the building breaking down, dropping down suddenly, and falling in – and even some evidence of debris or rubble on the ground. This is sufficient to satisfy the definition of collapse explicitly set forth in *Curtsinger* and *Thiele*.

Our Supreme Court has not explicitly stated a requirement that a building or part thereof fall entirely to the ground or be reduced to rubble on the ground in defining *collapse*. And in any event, Gaston's affidavit testimony that he observed debris on the ground where a truss fell is evidence showing that any "rubble on the ground" requirement was met. *Rubble* is sometimes defined as synonymous with *debris*, after all. For example, one definition of *rubble* is: "The pile of crumbled debris that's left over after something breaks or collapses" and *debris* is listed as a synonym for *rubble*. *Rubble*, VOCABULARY https://www.vocabulary.com/dictionary/rubble (last visited Mar. 16, 2023).

The trial court erred in determining there was no collapse and thus no coverage under these facts because there was evidence of a collapse – as defined

by binding precedent without adding additional requirements not explicitly stated in precedent.

**Regardless, The Policy is Ambiguous and Must Be Construed to Afford Coverage**

Both *Curtsinger* and *Thiele* clearly hold that the word *collapse*, as referring to a building or part thereof, has a commonly understood plain meaning. So, we cannot say that the word *collapse* by itself is ambiguous – even when it is not defined in the policy. But even though the word *collapse* itself might not be ambiguous in this context, we conclude that the collapse coverage policy provision is ambiguous as applied to the facts here.

Ambiguities are not always facial; some ambiguities may instead arise when a provision is applied to the facts of a particular case. *St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 227 (Ky. 1994). The plain meaning of collapse set forth in binding Kentucky precedent does not expressly require that the building (or a part of it) fall all the way to the ground or be reduced to rubble on the ground. In fact, neither *Curtsinger* nor *Thiele* uses the word "rubble" or expressly states that collapse entails falling to the ground.

Nonetheless, the trial court described the approach in *Curtsinger* and *Thiele* as the "rubble on the ground" standard. And non-binding secondary authority cites *Curtsinger* among cases taking a comparatively strict approach to defining collapse as a "plain and unambiguous term which refers to a falling in,

loss of shape, or reduction to flattened form or rubble." Annotation, *What Constitutes "Collapse" of a Building Within Property Insurance Policy*, 71 A.L.R.3d 1072 § 3 (1976).

Counsel for Appellees argued in the written motion for partial summary judgment on coverage that there was clearly no collapse because neither the building nor any part of it had fallen to the ground. This suggests that although the word collapse has a commonly understood plain meaning, some interpret this plain meaning as connoting implicit requirements that something fall entirely to the ground or be reduced to rubble. Furthermore, there are some similarities, but also some important differences, between the facts here and those in *Curtsinger* and *Thiele*. So, applying the plain meaning of collapse set forth in binding precedent, we conclude there are different reasonable interpretations of whether the damage here amounted to a collapse covered by the policy – in other words, there is an ambiguity as applied to the facts here. Thus, the policy must be liberally construed in favor of coverage. *See, e.g.*, *Eyler*, 824 S.W.2d at 859-60; *St. Paul*, 870 S.W.2d at 227.

A contract is ambiguous if it is subject to more than one reasonable interpretation. *Vorherr v. Coldiron*, 525 S.W.3d 532, 543 (Ky. App. 2017). Here, even applying the plain meaning of *collapse* set forth in binding precedent, the parties have set forth differing interpretations – neither patently unreasonable –

-18-

whether there was a collapse subject to coverage here. The church argues that part of its building – the roof framework – collapsed under a plain meaning of collapse. But the insurer argues that no significant part of the building – meaning perhaps a room or a wing – fell entirely to the ground or was reduced to rubble.

It was reasonable for the church to expect that there was coverage for a collapse under the facts here, applying the "plain meaning" definition of *collapse* in *Curtsinger* and *Thiele*. After all, there is evidence suggesting that a part of the building (the roof structure) broke down, fell in, or caved in – even if this part of the building did not fall entirely to the ground. Colloquially, one might say that a roof or part of it collapsed when it dropped down suddenly and significantly even if not all the way to the ground – even though perhaps one might mean falling down to the ground or being reduced to rubble when talking about the collapse of a building.

Furthermore, *collapse* was not defined in the policy, despite the Supreme Court's suggesting insurers should define the term to make things clearer for their insureds in *Thiele*. *See* 522 S.W.3d at 200 ("As a practical matter, any long range effect of our decision could easily be minimized by the insurance companies in simply re-defining the 'collapse' exemption to meet our judicial definition."). We question whether an insured would be fairly advised of implicit requirements – such as "rubble on the ground" – which are not clearly stated in the

-19-

policy itself or in Kentucky precedent about the plain meaning of *collapse* in this context.

Given this ambiguity as applied to the facts here, and the church's reasonable expectation there would be coverage for the damage here given indications that part of the roof caved in, the policy must be liberally construed, and all doubts resolved in favor of affording coverage. *St. Paul*, 870 S.W.2d at 227. Furthermore, as the drafter of the policy, the insurer must be held responsible for the language used. *Eyler*, 824 S.W.2d .2d at 859-60.

As we conclude that there was an ambiguity as applied to the facts here regarding whether there was a collapse subject to the additional coverage provisions regarding collapse, we need not reach the church's other ambiguity argument – that an ambiguity was created by including both the collapse provisions and duty to mitigate provisions in the policy.[9]

---

[9] Conflict with the duty to mitigate has been noted in extra-jurisdictional authority to support the application of a broader definition of collapse. *See Hilton Head*, 357 F. Supp. 2d at 887 ("[A]s noted by courts rejecting the actual collapse standard, such an interpretation encourages an insured to neglect repairs and allow a building to fall, which is economically unsound and contrary to the insured's duty to mitigate damages."). But such policy arguments about defining *collapse* would be better directed to our Supreme Court – which, unlike this Court, has the authority to overrule its holdings in *Curtsinger* and *Thiele*. SCR 1.030(8)(a). But in any event, our conclusion that the policy is ambiguous as applied to the facts of this case does not depend upon any alleged conflict with the duty to mitigate damages. Instead, it is premised solely upon the ambiguity presented when applying the plain meaning of *collapse* set forth in precedent to the facts here in the absence of a more specific definition of *collapse* in the policy.

Instead, we conclude that there is ambiguity as applied to facts here regarding whether there was a collapse in terms of plain meaning expressed in precedent – which does not explicitly require something falling to the ground or being reduced to rubble. Should the insurer wish to be held responsible only for a narrower scope of coverage for collapse – such as only being obligated to pay if a building or any part abruptly falls to the ground or is reduced to rubble – it should clearly inform the insured of these requirements in the policy. Otherwise, in the absence of a more specific definition of *collapse* in a policy, the plain meaning definition set forth in Kentucky precedent – which does not clearly and explicitly state requirements for rubble on the ground or something falling all the way to the ground – applies. And any ambiguity arising in cases such as this must be construed against it to afford coverage. *See, e.g.*, *Bidwell*, 367 S.W.3d at 588.

In sum, as the policy is ambiguous under the facts here whether the damage amounted to a covered collapse, the trial court erred in granting summary judgment in favor of the insurer rather than the insured on the coverage issue.

**Non-Contractual Claims are Not Waived, but We Express No Opinion on Their Merits**

The church concedes that the viability of its other claims depends upon the existence of coverage. But as we reverse the trial court's resolution of the collapse coverage issue, other claims may also be viable now. As the church points out in its brief, the trial court did not substantively address the merits of

other claims alleged in the complaint in its orders other than to dismiss them as dependent on the existence of coverage.

Furthermore, we disagree with the Appellees' argument that any error in granting summary judgment in favor of the insurer on non-contractual claims has been waived by the lack of discussion about non-contractual claims against the insurer in the church's initial brief. As the church points out in its reply brief, it clearly appealed from all summary judgments entered – including those for both Appellees on all claims – premised on its arguments of error in the trial court's resolution of the coverage issue. Nonetheless, we express no opinion on the merits of any non-contractual claims.

Further arguments in the briefs not discussed herein have been determined to lack merit or relevance to our resolution of this appeal.

## CONCLUSION

For the reasons stated herein, we **REVERSE** the grant of summary judgment on all claims in favor of Appellees and **REMAND** with directions to enter partial summary judgment in favor of the church on coverage and for further proceedings in conformity with this Opinion.

ALL CONCUR.

BRIEFS FOR APPELLANT:

M. Austin Mehr
Bartley K. Hagerman
Lexington, Kentucky

BRIEF FOR APPELLEES:

James P. Nolan
Matthew F.X. Craven
Perry Adanick
Louisville, Kentucky

ORAL ARGUMENT FOR APPELLANT:

Bartley K. Hagerman
Lexington, Kentucky

ORAL ARGUMENT FOR APPELLEES:

Perry Adanick
Louisville, Kentucky